UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Gene Brehmer,

        Plaintiff,

v.                                                   Civ. No. 06-3294 (JNE/JJG)
                                                   ORDER

Xcel Energy, Inc.,

        Defendant.

---

Edward A. Zimmerman, Esq., The Business Lawyers, and Bryan R. Battina, Esq., Bock and Battina, appeared on behalf of Plaintiff Gene Brehmer.

Michael J. Moberg, Esq., and Ellen A. Brinkman, Esq., Briggs and Morgan, P.A., appeared on behalf of Defendant Xcel Energy, Inc.

---

Gene Brehmer brings this action against Xcel Energy, Inc. (Xcel) asserting claims for violations of the Family Medical Leave Act (FMLA), 29 U.S.C. § 2615 (a)(1) and (2) (2000), intentional interference with contractual relations, and intentional interference with future contracts and prospective business relations. The Complaint also alleges a claim for intentional infliction of emotional distress. However, counsel for Brehmer informed the Court that Brehmer is no longer pursuing this claim. The case is before the Court on Xcel's motion for summary judgment. For the reasons stated below, the motion is granted.

## I.      Background

Xcel is a Minnesota corporation that provides energy products and services. Brehmer is a journeyman lineman and a member of the International Brotherhood of Electrical Workers, Local 160 (Union). Brehmer began working for Xcel in 1988, where he performed electrical work on outside power lines until Xcel terminated his employment in 2004. During the first ten years of his employment with Xcel, Brehmer's job performance was unremarkable. However,

Xcel claims that beginning in 1999, issues arose regarding Brehmer's absenteeism from work and his compliance with Xcel's safety policies.

Brehmer disputes Xcel's claim that he had a problem with absenteeism during his employment at Xcel. However, it is undisputed that Brehmer's received a written reminder in January 1999 for taking unauthorized time off.[1] It is also undisputed that Brehmer took ten paid sick days in 2002 and eleven paid sick days in 2003. Pursuant to Xcel's sick leave policy, a policy to which the Union had agreed, once an employee reaches a career annual average of seven paid sick days, Xcel sends a letter to the Union stating that the employee has excessive sick time. If an employee reaches a career annual average of ten paid sick days, Xcel can revoke the employee's privilege of having paid sick time altogether. As of October 7, Brehmer had taken ten paid sick days in 2004.

It is also undisputed that Brehmer asked for five days of unpaid personal time in July 2004 so that he could accompany his girlfriend, Donna Dixon, and her child, Cody, to Texas. At the time Brehmer made the request, he had already exhausted all of his annual vacation days. At his deposition, Brehmer testified that Cody, who was eleven at the time, suffered from Tourette Syndrome, Attention Deficit Hyperactivity Disorder, and was "an alcohol baby with some brain damage." According to Brehmer, he needed to accompany Dixon to Texas because Cody easily became upset, stressed and agitated, and Dixon would need assistance. There is no dispute that in response to Brehmer's request, Xcel, Brehmer, and the Union entered into a written agreement

---

[1] According to the record, Xcel employs a three-step positive discipline program. The first step is an oral reminder, the second step is a written reminder, and the third step is decision-making leave. The Company is not required to follow the program in every situation or to follow the steps sequentially. If positive discipline does not result in a change in behavior, or if the offense is serious enough, Xcel may terminate the employee.

that permitted Brehmer to take the requested personal days provided Brehmer did not request any additional personal days in 2004.

Brehmer does not dispute that on November 5, 2004, he told his foreman that he had forgotten his cell phone at home and the two stopped at Brehmer's house on the way to another job site so he could retrieve it. Brehmer's deposition testimony indicated that while he was inside the house, he learned that Cody was having problems at school that required his attention and that he told the foreman he (Brehmer) was sick and did not accompany the foreman to the next job. Brehmer admitted that he then called Xcel and reported that he was sick and did not return to work that day.

Although Brehmer disputes Xcel's characterization of his violations of company safety policies, he does not deny that certain violations occurred. For example, Brehmer does not dispute that he received an oral reminder in May 2001 after he damaged an automobile while driving an Xcel boom truck at a job site. He testified that he should have been wearing rubber gloves while quickly stripping rubber hosing off of energized lines at the conclusion of a job in May 2004, although he stated that it was common practice for linemen not to do so.

It is undisputed that on October 25, 2004, Brehmer was assigned the task of watching an apprentice lineman perform work in a bucket up in the air. Brehmer denies that the apprentice was working on energized lines and denies that he left the apprentice unsupervised, as Xcel alleges. Brehmer does not, however, dispute that he left the job site for lunch while the apprentice was still up in the air working or that a foreman later reported Brehmer's conduct to a supervisor.

According to the deposition testimony of Brehmer's former supervisor, Jeff Custer, Brehmer failed to follow company policy regarding the reporting of traffic violations in 2004.

Brehmer  testified in his deposition that he forgot to report a traffic violation he received in May 2004 until December 1, 2004, despite his knowledge that, as a holder of a commercial driver's license, he was required to report the violation within thirty days.  Custer further testified that on several occasions, Brehmer took personal phone calls during department meetings.  According to Brehmer's deposition testimony, his cellular phone would sometimes ring during company safety meetings and he would either turn his cell phone off when it rang or step out of the meeting to answer the call.

Sometime in early December 2004, Brehmer asked Custer if he could have December 15 off from work because Dixon was scheduled to have surgery.  There is a dispute between the parties regarding the exact date Brehmer told Custer that he needed the day off.  Brehmer claims he first told Custer about the surgery several weeks before December 15, and he asserts that he told Custer about it on numerous other occasions before a final conversation on December 14.  Custer testified in his deposition that Brehmer first told him he needed the day off for Dixon's surgery on December 13, and that he denied Brehmer's request and reminded him of his prior agreement to refrain from taking additional personal time off during 2004.  There is no dispute that, at the end of his shift on December 14, Brehmer informed Custer he would not report for work the next day and that he would not call in to report his absence because Dixon's surgery was scheduled for very early in the morning.

There is also a dispute over whether Brehmer told Custer he needed December 15 off because he needed to care for Cody during Dixon's surgery.  According to Custer's deposition testimony, Brehmer requested the day off because his girlfriend was having surgery and did not say anything about caring for Cody when he made the request.  Brehmer provides conflicting testimony.  At his deposition, he testified that he did not know for sure, that he could not recall,

and then "Yeah, I suppose, yeah I could have" when asked whether he mentioned Cody when he asked to have December 15 off.  In a later affidavit, discussed more fully below, Brehmer stated that he told Custer about his need to care for Cody several weeks before Dixon's surgery and then again on two more occasions a week and a half before Dixon's surgery, once at a job site near Highway 62 and once in Custer's office.

It is undisputed that, on the morning on December 15, Brehmer took Dixon to the hospital for her surgery and that he did not call Xcel to report his absence.  Brehmer testified that he stayed at the hospital until Dixon was in surgery, and then he went to check on Cody, who had stayed home from school and was at Dixon's home under the care of Dixon's sister and an unidentified male tenant who rented the basement of Dixon's home.  Brehmer testified that he traveled back and forth between the hospital and Dixon's home several times that day to check on Cody.  Brehmer returned to work at Xcel the following day.  Dixon remained in the hospital for several weeks.

Upon his return to work, Xcel sent Brehmer home on "crisis suspension," a paid day of leave, to allow Xcel to consider possible misconduct by Brehmer and to decide whether to discipline or terminate him.  Custer drafted a memo to Larry Crosby, Xcel's Director of Metro West Operations at the time, describing incidents of Brehmer's absenteeism, safety violations, and failure to follow the direction of his supervisors.  Custer recommended that Xcel immediately terminate Brehmer.  Xcel then terminated Brehmer citing "his defiant refusal to follow a direct order of his manager" and "a pattern of behavior showing blatant disregard for authority" as the reasons.  After his termination, Brehmer contacted the Union and sought to file a grievance for wrongful termination.  The Union filed a grievance but later withdrew it.

In January 2006, the Union assigned Brehmer to work as a lineman for Donovan Construction (Donovan).  Donovan is a power line contractor for Xcel.  Crosby testified that it is Xcel's practice to deny terminated employees access to Xcel facilities and property, and that consistent with this practice, Xcel's contractor agreement with Donovan provides Xcel with the right to request the removal of Donovan employees from Xcel's property.  According to Crosby's deposition testimony, when Xcel learned that Brehmer was performing work for Donovan on Xcel's lines, Xcel informed Donovan that Brehmer could not work on Xcel property.  There is no dispute that following this request, Donovan terminated Brehmer's employment.

Brehmer subsequently sought work through the Union.  He testified that during the year or so after his termination from Donovan, he worked for (1) a company in Richfield, Minnesota, where he changed street lights, (2) a construction company in Ladysmith, Wisconsin, where he performed transmission line work, (3) a power company in Duluth, Minnesota, where he rebuilt power lines, and (4) a power company in Superior, Wisconsin, where he performed transmission line work.  Brehmer left his job in Superior, Wisconsin, after a foot injury made it too painful for him to continue working.  According to Brehmer's deposition testimony, in March 2007, after he had recovered from his foot pain, the Union sent him to work for a company in Blaine, Minnesota, where he installed wireless internet transmitters in Minneapolis.  After he was laid off, the Union sent Bremer to another Minneapolis company where he performed the same work.

In July 2006, Brehmer brought this action against Xcel alleging violations of the FMLA, intentional interference with his contract with Donovan, and intentional interference with future contracts and prospective business relations.  Xcel seeks summary judgment on all of Brehmer's claims.

## II.      Discussion

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The movant "bears the initial responsibility of informing the district court of the basis for its motion," and must identify "those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).  If the movant satisfies its burden, the party opposing the motion must go beyond the pleadings and "set out specific facts," by depositions, affidavits, or otherwise, "showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2); *see*, *e.g.*, *Baum v. Helget Gas Prods., Inc.*, 440 F.3d 1019, 1022 (8th Cir. 2006).  In determining whether summary judgment is appropriate, a court must look at the record and any inferences to be drawn from it in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## A.      Admissibility of Brehmer's affidavit

The Court first addresses Xcel's objections to Brehmer's affidavit.  Brehmer submitted a sworn affidavit in support of his memorandum in opposition to Xcel's summary judgment motion.  Xcel contends it is "sham affidavit" submitted by Brehmer after reviewing Xcel's summary judgment motion in an effort to create a genuine issue of material fact where none exists.  Xcel urges the Court to disregard the affidavit in its entirety.

The Eighth Circuit Court of Appeals has addressed the issue of sham affidavits, stating:

> Parties to a motion for summary judgment cannot create sham issues of fact in an effort to defeat summary judgment.  Courts must not deprive juries from their role in deciding genuine disputes of material fact, however, parties should not be permitted to fashion a dispute of material fact solely to impede a lawful exercise of granting a motion for summary judgment.  While district courts must exercise extreme care not to take genuine issues of fact away from

juries, a party should not be allowed to create issues of credibility by contradicting his own earlier testimony.  Ambiguities and even conflicts in a deponent's testimony are generally matters for the jury to sort out, but a district court may grant summary judgment where a party's sudden and unexplained revision of testimony creates an issue of fact where none existed before.  Otherwise, any party could head off a summary judgment motion by supplanting previous depositions *ad hoc* with a new affidavit, and no case would ever be appropriate for summary judgment.

*Am. Airlines, Inc. v. KLM Royal Dutch Airlines, Inc.*, 114 F.3d 108, 111 (8th Cir. 1997) (citations omitted).

In response to Xcel's allegation, Brehmer's counsel indicated at oral argument that Brehmer's affidavit was submitted to provide factual details that were foreclosed during discovery due to the objections of Xcel's counsel during Brehmer's deposition.  Review of the deposition transcript indicates Xcel's counsel objected to the leading form of questions posed by Brehmer's counsel when counsel inquired about what Brehmer told Custer on December 13 regarding why he needed the day off on December 15.  For example:

Q:    Now, I think you testified that you had spoken to Mr. Custer a number of times about the need to be off that day, and that you had spoken to him several times before December 13th, which is the first time he identified your speaking to him.

A:    Uh-huh.

Q:    This, as Counsel has just pointed out, is an answer to the interrogatory under oath. Do you believe that you told him you wanted to care for your ward because of the stress of that operation?

A:    Yeah, I suppose, yeah, I could have, you know.  He—Cody didn't go to school that day, and I was at the hospital and back to their house, and I don't know from one day to the [sic] another to the next who is going to be there.  I'm saying, you know, and there were people there that, you know, I trusted, and I did check on him.

Q:    Well this has to do with what you told Mr. Custer.  Do you have a clear recollection of exactly what you told him today as we sit here?

A:    I told him that I took Donna to the hospital early and –

Q:     That you couldn't call in the morning?

A:     Yeah. Yeah.

Q:     That was once you knew when you would have to go?

A:     Yeah.

Q:     But on the other times when you told him what you had to do that day, would that have been before you knew when you had to go in?

A:     Yeah.

Q:     So the thing that sticks out in your mind about what you told him on the 13th is that you couldn't call in?

Mr. Moberg [Xcel's counsel]: Wait a minute, hold on, Counsel, I am going to object.

Mr. Zimmerman:     Okay, I am leading, I am sorry, I will rephrase.

Mr. Moberg:     He is your witness, and you don't get to lead him around by a collar and testifying [sic] on his behalf.

Mr. Zimmerman:     And I apologize.

Mr. Moberg:     I have no problem if you were trying to clarify what you view is inconsistent testimony, but we are not going to spend the rest of the afternoon during my deposition of him for you to rehabilitate and resurrect your client.

Mr. Zimmerman:     Fair enough.  I stand corrected, and accept it. Sorry.  I will withdraw the question.  And your objection was appropriate.

Following this exchange, however, Brehmer's counsel did not rephrase his question.  On this record, the Court cannot conclude that Brehmer was foreclosed from providing sufficient factual details during his deposition.  Furthermore, the record contains no explanation of why Brehmer submitted his affidavit almost five months after his deposition was taken and only after Xcel had filed its motion for summary judgment.  Under these circumstances, the Court views

Brehmer's affidavit with suspicion.  *See Am. Airlines*, 114 F.3d at 111.  "[A] properly supported

motion for summary judgment is not defeated by self-serving affidavits."  *Conolly v. Clark*, 457

F.3d 872, 876 (8th Cir. 2006).

Accordingly, where the affidavit contradicts Brehmer's prior deposition testimony, as it

does on the issue of Brehmer's notice to Xcel regarding the purpose of his need for leave on

December 15, the Court will not consider the affidavit.  *See Am. Airlines*, 114 F.3d at 111.  On

the other hand, where Brehmer's affidavit is consistent with his prior deposition testimony, or it

merely seeks to add more detailed information to that testimony, as it does on the issue of

Brehmer's parental relationship with Cody, the Court will consider the affidavit.  *See Bass v.

City of Sioux Falls*, 232 F.3d 615, 619 (8th Cir. 1999) (indicating consideration of subsequent

affidavit testimony on summary judgment is proper where it seems consistent with the affiant's

prior deposition testimony).

**B.       Family Medical Leave Act claims**

The FMLA, as relevant to this case, gives an eligible employee the right to take up to

twelve weeks of leave during any twelve-month period in order to care for a family member who

has a serious health condition.  *See* 29 U.S.C. § 2612(a)(1)(C) (2000).  An employee who takes

FMLA leave generally has the right, upon returning from leave, to be reinstated either to the

position that he occupied when he went on leave or to an equivalent position.  *Id.* § 2614(a)(1)

(2000).

The FMLA creates two types of claims:  "interference" claims and "retaliation" claims.

Interference claims are based on 29 U.S.C. § 2615(a)(1), which forbids employers to interfere

with or deny the exercise of any right provided by the FMLA.  Retaliation claims are based on

29 U.S.C. § 2615(a)(2), which forbids employers to discriminate against employees for

exercising their FMLA rights.  Establishing discriminatory intent on the part of the employer is essential to proving a retaliation claim, but it is irrelevant to proving an interference claim. *Throneberry v. McGehee Desha County Hosp.*, 403 F.3d 972, 976 (8th Cir. 2005).  Brehmer's Complaint alleges both interference and retaliation claims.

### 1.     FMLA interference claim

To prevail on his interference claim, Brehmer must establish that (1) he is an eligible employee; (2) Xcel is an employer; (3) he was entitled to leave under the FMLA; (4) he gave Xcel notice of his intention to take leave; and (5) Xcel denied him FMLA benefits to which he was entitled.  *See Cavin v. Honda of Am. Mfg., Inc.*, 346 F.3d 713, 719 (6th Cir. 2003) (citing 29 U.S.C. §§ 2611(2), (4); *Id.* § 2612(a)(1), (e)(1)); *see also Hastings v. Carlson Mktg. Group, Inc.*, No. 04-3370, 2005 WL 2837391, at *4 (D. Minn. Oct. 27, 2005) (quoting *Cavin*, 346 F.3d at 719.)  There are no disputes regarding the first two elements.  However, Xcel challenges Brehmer's ability to prove the third and fourth elements of his interference claim.

### a.     Entitled to leave under the FMLA

To demonstrate entitlement to FMLA leave on December 15, 2004, Brehmer must show that his absence was to "care for the spouse, or a son, daughter, or parent . . . [who] has a serious health condition."  29 U.S.C. § 2612(a)(1)(C); *see Frazier v. Iowa Beef Processors, Inc*., 200 F.3d 1190, 1195 (8th Cir. 2000).  Brehmer does not dispute that the FMLA only provides protected leave to care for family members and concedes that he was not entitled to FMLA leave on December 15 to care for his girlfriend Dixon.  Brehmer alleges he was entitled to take FMLA leave to care for Dixon's son, Cody, who, Brehmer asserts, was also his "son," as that term is defined by the FMLA.

Under the FMLA, a son means "a biological, adopted, or foster child, a step child, a legal ward, or a child of a person standing in loco parentis." 29 C.F.R. § 825.113(c) (2007). It appears that Brehmer makes two arguments in support of his assertion that Cody was his son under the FMLA on December 15: (1) Cody was his legal ward, and (2) Brehmer stood in loco parentis of Cody.

### i.      Legal ward

In his Complaint, Brehmer alleges that Cody was his legal ward on December 15, 2004. Brehmer does not provide any further factual support for this assertion. At oral argument, Brehmer's counsel acknowledged his erroneous reliance on the facts as set forth in the Complaint in opposing summary judgment due to his mistaken belief that the Complaint was verified when it was first filed in state court. *See Roberson v. Hayti Police Dept.*, 241 F.3d 992, 994 (8th Cir. 2001) (indicating a plaintiff's verified complaint is the equivalent of an affidavit for purposes of summary judgment). As previously noted, in order to survive summary judgment, Brehmer must go beyond the pleadings and set out specific facts, by depositions, affidavits, or otherwise, showing a genuine issue for trial. Fed. R. Civ. P. 56(e)(2); *Baum*, 440 F.3d at 1022; *see also Anderson*, 477 U.S. at 248 (indicating that a nonmoving party must offer proof "such that a reasonable jury could return a verdict for the nonmoving party."). The Court concludes that Brehmer has abandoned this argument.

### ii.      In loco parentis

Brehmer also argues that Cody qualified as his son under the FMLA in December 2004, because Brehmer stood in loco parentis of Cody at that time. "Persons who are 'in loco parentis' include those with day-to-day responsibilities to care for and financially support a child or, in the case of an employee, who had such responsibility for the employee when the employee was a

child.  A biological or legal relationship is not necessary."  29 C.F.R. § 825.113(c)(3); *see also*

*Miller v. United States*, 123 F.2d 715 (8th Cir. 1941), *rev'd on other grounds*, 317 U.S. 192

(1942) ("[I]t is also well recognized that the term 'parent' in a broad sense and under certain

circumstances may include anyone who stands in a position equivalent to that of a parent.").

At his deposition, Brehmer testified that both he cared for Cody in a "parenting role."  In

his subsequently submitted affidavit, Brehmer provided additional information about his

parenting role, stating that he cared for Cody "as if he were my son" and that he "tried to do my

best to be a dad."  Brehmer stated that he helped Cody eat, dress, and go to bed; that he drove

Cody to doctor appointments and to school; that he went to Cody's softball games; and that he

went to Cody's school when Cody had problems there.  Brehmer also stated that for several

months before December 15, 2004, and for a year after, he contributed more than half of Cody's

financial support.  Because Brehmer's affidavit testimony is consistent with and further clarifies

his prior deposition testimony regarding his parental role with Cody, the Court includes the

affidavit testimony in its consideration of Brehmer's in loco parentis status with regard to Cody.

*See Bass*, 232 F.3d at 619.  Construing the facts in light most favorable to Brehmer, the Court

concludes that an issue of material fact exists as to Brehmer's in loco parentis status of Cody on

December 15, 2004.

*iii.     Serious health condition*

Even if Brehmer stood in loco parentis to Cody on December 15, 2004, to defeat Xcel's

motion for summary judgment on his interference claim, Brehmer must also demonstrate that

Cody suffered from a serious heath condition on December 15 to establish his eligibility for

FMLA leave to care for Cody.  The FMLA defines "serious health condition" as "an illness,

injury, impairment, or physical or mental condition that involves (A) inpatient care in a hospital,

hospice, or residential medical care facility; or (B) continuing treatment by a health care

provider." 29 U.S.C § 2611(11) (2000).

In this action, the relevant provision is "continuing treatment by a health care provider."

*Id.* § 2611(11)(B).  The requirements for a condition that involves "continuing treatment by a

health care provider" are set out in the Department of Labor's rules implementing the FMLA.  29

C.F.R. § 825.114 (2007); *see* 29 U.S.C. § 2654 (2000) (directing the Secretary of Labor "to

prescribe such regulations as are necessary to carry out" the FMLA).  Continuing treatment is

defined as "incapacity of more than three consecutive calendar days" with "subsequent treatment

or further incapacity relating to the same condition."  *Caldwell v. Holland of Tex., Inc.*, 208 F.3d

671, 674 (8th Cir. 2000) (citing 29 C.F.R. § 825.114(a)(2)(i)).  The rules define "incapacity" as

"inability to work, attend school or perform other regular daily activities due to the serious health

condition, treatment therefor, or recovery therefrom."  29 C.F.R. § 825.114(a)(2)(i).

Xcel correctly points out that there is little in the record regarding Cody's medical

condition or his incapacity due to a medical condition.  Brehmer testified in his deposition that

Cody suffers from Tourette Syndrome and Attention Deficit Hyperactivity Disorder.  He

speculated about Cody's condition, saying "I believe he's an alcoholic baby.  He's got brain

damage . . . He can't concentrate for long periods on things."  In his affidavit Brehmer states that

Cody has a "brain injury disability" and "special needs" and that Cody gets "upset" and

"agitated."

Generally, a plaintiff's own statement is insufficient to establish incapacity under the

FMLA.  *See*, *e.g.*, *Schoonover v. ADM Corn Processing*, No. 06-CV-133-LRR, 2008 WL

282343, at *13 (N.D. Iowa Jan. 31, 2008); *Alston v. Sofa Express, Inc.*, No. 2:06cv0491, 2007

WL 3071662, at * 9 (S.D. Ohio Oct. 19, 2007) ("Because Plaintiff has come forward with no

evidence [other than his own testimony] that would establish that he had a serious health condition under any prong of the regulations, he was not entitled to any protections or benefits under the FMLA . . . ."); *Joslin v. Rockwell Int'l. Corp*, 8 F. Supp. 2d 1158, 1160-61 (N.D. Iowa 1998) (granting summary judgment for the defendant employer where the court found "no medical evidence in the record supporting the plaintiff's contention that she was incapacitated"); *Olsen v. Ohio Edison Co.*, 979 F. Supp. 1159, 1161 (N.D. Ohio 1997) (indicating that one's own claim that one cannot work because of illness is not sufficient to show incapacity under the FMLA); *Carter v. Rental Uniform Serv. of Culpeper, Inc.*, 977 F. Supp. 753, 761 (W.D. Va. 1997) ("To the extent [the plaintiff] contends she has satisfied pleading requirements simply by alleging she has a 'serious health condition,' she is mistaken; whether her illness qualifies . . . is a legal question that she cannot dispose of simply by alleging it to be so."); *Brannon v. OshKosh B'Gosh, Inc.*, 897 F. Supp. 1028, 1037 (M.D. Tenn. 1995) (finding plaintiff's testimony that she was too sick to work insufficient to satisfy her burden on summary judgment, even though it was undisputed that she had been given three prescriptions by her doctor); *cf. Rankin v. Seagate Techs., Inc.*, 246 F.3d 1145, 1148  (8th Cir. 2001) (disagreeing with district court's conclusion that the only evidence indicating incapacity was employee's own affidavit that she was "too sick to work" and reversing summary judgment because employee's testimony, *together with medical records*, was sufficient to create a genuine issue of material fact).

Here, the record is devoid of any medical evidence regarding Cody's medical condition or treatment.  Brehmer has not offered any medical evidence of a diagnosis for Cody.  Nor has he offered any medical evidence regarding the severity of any condition from which he alleges Cody suffers or the type or duration of treatment Cody has received for any such conditions. Moreover, there is no evidence in the record that Cody suffered from a medical condition that

required any further care after Dixon's surgery on December 15, and it is undisputed that although Cody's mother remained in the hospital for several weeks following her December 15 surgery, Brehmer returned to work at Xcel the very next day.

Viewing the record in light most favorable to Brehmer, the Court concludes that Brehmer has failed to raise a genuine issue of material fact as to whether Cody suffered from any serious medical condition in December 2004 for which Brehmer would qualify for protected leave under the FMLA. "Where an employee has not shown his absences to be a result of a serious health condition, he is not protected by the FMLA." *Frazier*, 200 F.3d at 1195; *see also Rankin*, 246 F.3d at 1147. Without evidence that Cody suffered from a serious health condition, Brehmer cannot establish that he was entitled to take FMLA leave to care for Cody, a required element of his FMLA interference claim.

iv.       *"To care for"*

Even if Brehmer could sufficiently establish that Cody suffered from a serious health condition that required his care on December 15, 2004, the undisputed facts before the Court are that Brehmer did not actually care for Cody on that day. Rather, Brehmer accompanied Dixon to the hospital early in the morning, leaving Cody in the care of Dixon's sister and Dixon's unidentified tenant. Brehmer does not dispute that his contact with Cody on December 15 only occurred when he left the hospital several times during the day to travel to Dixon's home and "check on" Cody. While Brehmer's actions toward Cody and his concern for Cody may be laudable, they do not qualify under the broadest reading of the statute as physical or psychological care under the FMLA. The FMLA does not protect mere visitation. *See Fioto v. Manhattan Woods Golf Enters., LLC*, 270 F. Supp. 2d 401, 404 (S.D.N.Y. 2003), *aff'd*, 123 Fed. Appx. 26 (2d Cir. 2005). Because there is no dispute of material fact that Brehmer did not care

16

for Cody on December 15, Brehmer cannot establish that his absence from work on that day was due to his taking protected leave under the FMLA to care for Cody.

In sum, in order to survive summary judgment on his FMLA interference claim, Brehmer must establish a prima facie case of his eligibility to take FMLA leave to care for Cody on December 15, 2004.  *See Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1050 (8th Cir. 2006) (requiring a showing of entitlement to the protected benefit in a FMLA interference claim).  On the record before it, the Court concludes that Brehmer has failed his burden and that summary judgment in favor of Xcel on Brehmer's FMLA interference claim is appropriate.  *See Celotex*, 477 U.S. at 322 (indicating that when a nonmoving party fails to make a specific showing on an essential element of that party's claim, summary judgment is appropriate.).

### b.      Notice

Xcel also challenges Brehmer's FMLA interference claim on the grounds that Brehmer cannot prove that he provided adequate notice of his intention to take protected leave on December 15, 2004.  In order to benefit from the protections of the FMLA, an employee must provide his employer with enough information to show that he may need FMLA leave.  *Woods v. Daimlerchrysler Corp.*, 409 F.3d  984, 990 (8th Cir. 2005).  When an employee gives notice, it is not necessary for the employee to name the statute, but the employee must express both the need and reason for the leave.  29 C.F.R. § 825.302(c) (2007); *see also Woods*, 409 F.3d at 990.  In connection with the need for leave, if the need is foreseeable, an employee must give her employer no less than thirty days advance notice.  *See* 29 U.S.C. § 2612(e)(1),(2)(B); 29 C.F.R. § 825.302.  If the need for leave is unforeseeable, an employee must give her employer notice as soon as practicable, but within no more than two working days of learning the need for leave.  29 C.F.R. § 825.303 (2007).  A "mere declaration . . . that a family member is ill, is insufficient to

comply with the FMLA notice requirement." *McGraw v. Sears, Roebuck & Co.*, 21 F. Supp. 2d

1017, 1022 (D. Minn. 1998).  Because Brehmer fails to establish a prima facie case of eligibility

to take FMLA leave to care for Cody on December 15, the Court need not decide whether

Brehmer provided sufficient notice to Xcel of his intention to take any such protected leave.[2]

*See Celotex*, 477 U.S. at 322.

>    **2.      FMLA retaliation claim**

Brehmer also asserts a FMLA retaliation claim against Xcel.  For a FMLA retaliation

claim to survive a motion for summary judgment, a plaintiff must establish a prima facie

showing of wrongful retaliation.  *McBurney v. Stew Hansen's Dodge City, Inc.*, 398 F.3d 998,

1002-03 (8th Cir. 2005).  To do so, a plaintiff must show that (1) he engaged in conduct

protected under the FMLA, (2) he suffered an adverse employment action, and (3) there is a

causal connection between the two.  *Id.*

Because Brehmer has failed to raise any genuine issue of fact that he was eligible to take

FMLA leave to care for Cody on December 15, 2004, he cannot establish a prima facie claim

that he engaged in FMLA protected activity that led to an improper retaliatory termination of his

employment by Xcel.  *See Schmittou v. Wal-Mart Stores, Inc.*, Civ. No. 011763, 2003 WL

22075763, at *7 (D. Minn. Aug. 22, 2003) ("[Plaintiff] was not eligible for leave under the

---

[2]      Nonetheless, the Court notes that Brehmer's affidavit testimony submitted in support of
his opposition to Xcel's motion for summary judgment contradicts his prior deposition testimony
on this issue.  During his deposition Brehmer's recollection of his conversations with Custer
were vague and unspecific.  He repeatedly stated that he "did not know for sure" or could not
recall whether he advised Custer that he needed December 15 off from work to care for Cody.
Yet his affidavit, prepared five months later, provides many specific and favorable details about
conversations Brehmer claims he had with Custer in the weeks before Dixon's surgery about
Cody's condition and the need to care for Cody on the day of his mother's surgery.  The Eighth
Circuit Court of Appeals has directed the rejection of this type of self-serving post-deposition
affidavit testimony.  *See Am. Airlines*, 114 F.3d at 111.

FMLA, so it is impossible for her to engage in any activity protected by the statute."). Under

these circumstances, Xcel is entitled to summary judgment on Brehmer's retaliation claim.

**C.    Intentional interference with contractual relations**

In addition to his FMLA claims, Brehmer alleges that Xcel intentionally interfered with

his contractual relations with Donovan. Brehmer asserts that Xcel owned 100% of the power

lines in the Twin Cities metropolitan area and that Xcel's exclusion of Brehmer from its property

effectively caused the termination of his employment with Donovan. Xcel denies it interfered

with Brehmer's contract and claims that it was enforcing its company policy and exercising its

contractual rights when it informed Donovan that Brehmer could not work on Xcel property.

Xcel claims it never sought the termination of Brehmer's employment with Donovan.

In Minnesota, a claim for wrongful interference with a contractual relation requires "(1)

the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) intentional

procurement of the breach; (4) without justification; and (5) damages." *Peterson v. County of

Dakota*, 479 F.3d 555, 559 (8th Cir. 2007) (quoting *Furlev Sales & Assocs., Inc. v. N. Am. Auto.

Warehouse, Inc.*, 325 N.W.2d 20, 25 (Minn. 1982)); *Kjesbo v. Ricks*, 517 N.W.2d 585, 588

(Minn. 1994). The parties do not dispute the existence of a contract between Brehmer and

Donovan. Xcel does not deny its knowledge of that contract. However, Xcel denies it

intentionally procured a breach of Brehmer's contract with Donovan and argues that Brehmer

has failed to raise a material issue of fact that Xcel intentionally procured any such breach. The

Court agrees.

Crosby testified that Xcel only advised Donovan that Brehmer could not work on Xcel

property after it learned that he was working for Donovan on Xcel power lines. Crosby also

testified that Xcel does not own all of the outdoor power lines in the Twin Cities metropolitan

area and that, to his knowledge, Donovan worked for entities other than Xcel.  Without citing to

any legal authority, other than to identify the "procurement of the breach" element of his claim,

and without pointing to any specific evidence in the record, Brehmer responded with the

following argument:

> Merely by the fact that Xcel was aware Donovan employed Plaintiff, and that
> because it owned all outside lines in the Metro area, it could reasonably foresee
> that ejecting Plaintiff from its property would likely result in Plaintiff's
> termination, common sense dictates that Xcel must have had the intent to
> interfere with Donovan's and Plaintiff's contract.

Aside from these unsupported allegations and speculative and conclusory assertions, Brehmer

fails to present any documents or testimony establishing Xcel's ownership of all of the power

lines in the Twin Cities metropolitan area.  Nor has Brehmer presented any evidence showing

that Xcel sought the termination of his employment from Donovan by informing Donovan that

Brehmer could not work on Xcel property.

Although all reasonable inferences must be drawn in Brehmer's favor, he may not "rest

on mere allegations or denials" but must demonstrate on the record the existence of specific facts

which create a genuine issue for trial.  *See Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th

Cir. 1995) (citing Fed. R. Civ. P. 56(e)).  "Evidence, not contentions, avoids summary

judgment."  *Mayer v. Nextel W. Corp.*, 318 F.3d 803, 809 (8th Cir. 2003); *Armour and Co., Inc.

v. Inver Grove Heights*, 2 F.3d 276, 279 (8th Cir. 1993) ("Self-serving, conclusory statements

without support are not sufficient to defeat summary judgment."); *see also JRT, Inc. v. TCBY

Sys., Inc.*, 52 F.3d 734, 737 (8th Cir. 1995) ("[A] successful summary judgment defense requires

more than argument or re-allegation; [the party] must demonstrate that at trial it may be able to

put on admissible evidence proving its allegations.").  Brehmer's failure to provide any evidence

showing that Xcel intentionally interfered with his contractual relations with Donovan is thus

dispositive.  He cannot rely on unreasonable inferences or speculation to establish the necessary

evidentiary basis required to defeat Xcel's motion for summary judgment on his intentional

interference with contractual relations claim.  *Sip-Top, Inc. v. Ekco Group, Inc.*, 86 F.3d 827,

832 (8th Cir. 1996).[3]

**D.    Intentional interference with future contracts and prospective business relations**

Brehmer also alleges Xcel improperly interfered with his future contracts and prospective

business relations by excluding him from Xcel's property.  To prevail on this claim, Brehmer

must establish that Xcel intentionally committed a wrongful act that improperly interfered with

his prospective business relationships.  *See United Wild Rice, Inc., v. Nelson*, 313 N.W.2d 628,

633 (Minn. 1983).  Xcel asserts that there are no issues of material fact in dispute regarding

Xcel's right to exclude terminated employees from its property and that Brehmer has thus failed

to demonstrate Xcel intentionally committed a wrongful act.  The Court agrees.

According to Xcel's interrogatory responses, "[g]enerally, when the Company learns that

a terminated employee seeks access to Company facilities, the Company denies such access."

Crosby testified that Xcel's policy of excluding terminated employees from subsequently

working on Xcel property was due to Xcel's interests in the safety of its employees.  He testified

that Xcel applies the policy to all employees, because Xcel "cannot get into the governance of

our augmenting resource . . . we can't slice and dice at that micro level."  Crosby explained that

Xcel's practice is "if you've been terminated for workmanship and/or other cause on our

property, our practice is that we do not allow you to work on our property thereafter."

---

[3]    Xcel also argues that its exclusion of Brehmer from Xcel property was justified.  The Court need not address this fourth element of Brehmer's intentional interference with contractual relations claim, because Brehmer has failed to establish the claim's required third element.  *See Celotex*, 477 U.S. at 322.

Crosby also testified that the contractor agreement between Xcel and Donovan granted Xcel the right to control who worked on its property by requesting that Donovan remove one of its employees from a worksite if Xcel deems that employee unfit.  According to Crosby, in Brehmer's case, because of his history of violations of Xcel's safety procedures, the exclusion policy protected both Brehmer and any of Xcel's employees who might perform work on power lines on which Brehmer had previously worked.  Although Brehmer attempts to explain the circumstances surrounding his safety violations while employed by Xcel in his affidavit, he admits that he failed to follow safety procedures when he damaged a car with the boom of an Xcel truck that he was operating in May 2001 and when he failed to wear rubber gloves while working on energized lines in March 2004.  He also admits that he failed to report his May 2004 traffic violation within the thirty-day reporting period required under Xcel's policy.  Brehmer's undisputed safety violations in Brehmer's employment record lend further support to Xcel's assertions that its interest in safety underlies its exclusion policy and its application to Brehmer.

In response, Brehmer claims Xcel's exclusion policy is a "blind company policy" and that "being the owner of all outside power lines in the Minneapolis Metro area, Xcel should have easily known that [Brehmer's] inability to work on Xcel property would foreclose any and all of his opportunities as an outside contractor in the Metro."  Once again, Brehmer argues that under these circumstances, "common sense" dictates a finding that Xcel wrongfully intended to deprive him of the benefit of future employment contracts.  As previously discussed, the only evidence offered by Brehmer is his own self-serving contentions and conclusory allegations that Xcel owned all of the power lines in the Twin Cities metropolitan area.  Such evidence is insufficient to establish the necessary evidentiary basis of his claim to defeat a motion for summary judgment.  *See Krenik*, 47 F.3d at 957; *Mayer*, 318 F.3d at 809; *Armour*, 2 F.3d at 279.

Moreover, Brehmer fails to identify any particular future business relationships of which he was deprived as a result of his exclusion from Xcel's property.  Brehmer merely states that "[i]f Xcel called one employer, it could and would certainly call another."  "The mere loss of unspecified business does not establish the tort of intentional interference with prospective business relations under Minnesota law.  Rather, wrongful interference with prospective business relations requires intentional conduct affecting specific relationships."  *H Enters. Int'l v. Gen. Elec. Capital Corp.*, 833 F. Supp. 1405, 1417 (D. Minn. 1993) (citing *Witte Transp. Co. v. Murphy Motor Freight Lines, Inc.*, 93 N.W.2d 148, 151 (Minn. 1971)).

"Once a moving party has demonstrated that the record does not disclose a genuine dispute on a material fact, it is the burden of the nonmoving party to set forth affirmative evidence, specific facts, showing there is a genuine dispute on that issue."  *Counts v. MK-Ferguson Co.*, 862 F.2d 1338 (8th Cir. 1988).  "If the nonmoving party fails to carry that burden, summary judgment should be granted."  *Id.*  Brehmer has failed to meet his burden, and summary judgment in favor of Xcel is warranted on his intentional interference with future contracts and prospective business relations claim.

### III.    Conclusion

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1.      Xcel Energy, Inc.'s Motion for Summary Judgment [Docket No. 17] is
        GRANTED.

2.      The Complaint [Docket No. 1] is DISMISSED WITH PREJUDICE.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  August 4, 2008

                                        s/  Joan N. Ericksen
                                        JOAN N. ERICKSEN
                                        United States District Judge